IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO


PRISCILLA QUINONES and DAVID MONREAL,

    Plaintiffs,

  -vs-                                                                                                                                                No. Civ. 08-0030 LH/KBM

THE BOARD OF COUNTY COMMISSIONERS
OF THE COUNTY OF OTERO and DEPUTY AL
GUTIERREZ, DEPUTY LEWIS REEVES, and
DEPUTY STEVE ODUM,[1] of the Otero County
Sheriff's Department,

    Defendants.


**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on Defendants' Motion for Summary Judgment (Docket No. 32), filed November 26, 2008. The Court, having reviewed the Motion, the memoranda of the parties, and the applicable law, and otherwise being fully advised, finds that Defendants' Motion is not well taken and will be **denied**.

In the early morning hours of May 13, 2006, Plaintiffs Priscilla Quinones ("Ms. Quinones") and Border Patrol Agent David Monreal ("Agent Monreal") pulled their car to the side of the road to sleep. At approximately 6:54 a.m., Otero County Sheriff's Deputy Alfonso Gutierrez ("Deputy Gutierrez") was dispatched to investigate a citizen's call-in report of two unresponsive individuals

---

    [1] Deputy Odum's name apparently is misspelled in the Complaint for Damages and, thus, the caption for this case. The correct spelling, however, is used throughout this Memorandum Opinion and Order.

in a parked vehicle. Deputy Gutierrez did not find the vehicle where he was told it would be, raising his concern that he might be dealing with a "rolling" domestic violence call.

Upon locating the vehicle, Deputy Gutierrez exited his patrol car, drawing his duty weapon for officer protection. As he approached, he noticed a glass pipe commonly used to smoke methamphetamine on the roadside, around 25 to 30 feet south of the vehicle.[2] He also observed Ms. Quinones lying on the back seat with her feet protruding out the open door on the passenger side and her face and hands concealed by clothing hanging from the courtesy hook. He attempted to get her attention by tapping or kicking at[3] her foot, but she remained unresponsive. These facts caused Deputy Gutierrez to be concerned that he could be involved in a potentially violent encounter.

Otero County Sheriff's Department Community Service Officer Lewis Reeves ("Officer Reeves") also responded to the dispatch. Seeing Deputy Gutierrez first tap Ms. Quinones' foot and then approach the front of the vehicle with his weapon drawn, Officer Reeves drew his weapon for officer safety purposes and moved so he could see in the back end. He couldn't tell who was in the back seat, but could see feet and long hair and assumed it was female lying with her head and face under the hanging clothes and her hands under her chest or her head, out of sight.

---

[2]   While Defendants maintain Deputy Gutierrez observed the glass pipe "near" Plaintiffs' car, it is clear that it was closer to Deputy Gutierrez's vehicle, which he parked 25 to 30 feet behind Plaintiffs. (*See* Defs.' Mot. Summ. J., Ex. A, Gutierrez Dep., 27:9-10 ("as I exit my vehicle . . . I see the meth pipe"); *id.* Ex. 1, Offense/Incident Report, at 2 ("As I approached the vehicle in question, I noted a glass pipe . . . on the road side, just south of the vehicle in question."); Pls.' Resp, Attach. 9, Gutierrez Dep., 49:16-21 ("Q. . . . You indicated . . . that as you approached the vehicle in question you noted a glass pipe . . . on the roadside just south of the vehicle in question. How far from the vehicle was the pipe? A. Around 25, 30 feet.")).

[3]   In his report written the day of the incident, Deputy Gutierrez stated that he "*kicked at* Quinones [sic] exposed heel" with his foot and "I *kicked at* Monreal.s [sic] buttock / thigh region" with his foot. (Defs.' Mot. Summ. J., Ex. A, Gutierrez Dep., Ex. 1 at 2, 3 (emphasis added).) In his deposition testimony, when asked "Did you kick both of them?" he responded, "Well, it wasn't more of a kick, it was more of a tap with my foot but yes. Actually I should have stated kicked at, I don't know how to." (*Id.* Ex. A, Gutierrez Dep. 31:3-8.)

Deputy Gutierrez next observed Agent Monreal slumped over in the front passenger seat of the vehicle with his hands concealed over the center console into the driver's seat.[4]  Deputy Gutierrez opened the front passenger-side door and attempted to get Agent Monreal's attention by tapping or kicking at his right thigh, but he was not responsive or compliant with the Deputy's instructions to show his hands.  Agent Monreal then momentarily revealed both hands, which were empty, and Deputy Gutierrez holstered his weapon and approached to restrain him.  Subsequently, however, Agent Monreal again concealed his left hand over the console and Deputy Gutierrez handcuffed his right wrist, pulled him from the vehicle, placed him face down on the ground, and handcuffed his left wrist.  Deputy Gutierrez conducted a pat down of Agent Monreal and removing his wallet from his pocket, found his credentials identifying him as a Border Patrol agent.

Officer Reeves instructed Ms. Quinones to get out of the car and show her hands, but she initially did not respond or comply.  After Deputy Gutierrez removed Agent Monreal from the front of the car, Officer Reeves tapped Ms. Quinones on her foot with his foot, again shouting for her to show her hands.  While Officer Reeves continued holding his weapon on her, Ms. Quinones eventually started moving, exited the car, and sat down on the ground.

Otero County Sheriff's Deputy Steven Odom ("Deputy Odom") was the third officer on the scene. On his arrival he saw Deputy Gutierrez handcuffing Agent Monreal and Officer Reeves with his weapon drawn. Walking around the Plaintiffs' vehicle, Deputy Odom saw Ms. Quinones sitting against the tire.  He handcuffed her and sat her back on the ground near the shoulder of the road, following which Officer Reeves holstered his weapon.

---

[4]  Plaintiffs contest whether Agent Monreal's hands could have been concealed, offering photographs showing Agent Monreal in various positions in the front passenger seat of the car.  For purposes of this Motion, however, the Court accepts Deputy Gutierrez's sworn deposition testimony that Agent Monreal's hand(s) were at times concealed from his view. *See Seamons v. Snow*, 206 F.3d 1021, 1026 (10th Cir. 2000) ("It is axiomatic that a judge may not evaluate the credibility of witnesses in deciding a motion for summary judgment.").

Ms. Quinones asked Deputy Odom what was going on, why this was happening, and he informed her that because they didn't know what was going on, she was being handcuffed for officer safety. When she made comments indicating she was upset, Deputy Odom told her that because she hadn't been complying with directions from the officers, she was lucky she wasn't getting a bullet in her head. At some point Deputy Odom also stated, regarding Agent Monreal, that "He was a Border Patrol agent. He was a Border Patrol agent."

Once Ms. Quinones was out of the vehicle, Officer Reeves saw an empty gun holster on the back floorboard. Also seeing the empty holster, Deputy Odom, asked Plaintiffs about it, but didn't get a response from either as to exactly where the weapon was.[5] He and Deputy Gutierrez proceeded to look through the vehicle for the weapon - in the back seat, under the front seats, in the front center console, around the crevasse in the backrests. Deputy Gutierrez then got the keys from the ignition and opened the trunk. Unzipping a black bag he removed from the trunk, Deputy Odom found the weapon, which he then secured in his police unit.[6]

After Plaintiffs had been handcuffed up to ten minutes, the deputies concluded that they were dealing with two individuals who had pulled off to the side of the road to sleep and that they were not a safety risk. They then uncuffed Ms. Quinones and Agent Monreal and Deputy Gutierrez directed dispatch to contact Border Patrol supervisors to come to the scene.

When Border Patrol Agent Guerena arrived, Deputy Gutierrez briefed him on the situation, along with Border Patrol Agent Holland, who also responded to the call. About thirty minutes after

---

[5] While Plaintiffs contend the Defendants never asked them about the location of Agent Monreal's gun, whether they did so inquire is not material to determination of the Motion before the Court.

[6] At some later point, Deputy Odum put the gun back in the black bag, put the bag back in the trunk of Agent Monreal's car, and closed the trunk.

answering the initial dispatch, Deputy Gutierrez gave the car keys to the Border Patrol supervisors and released Plaintiffs to Agent Guerena.

Three days later, Ms. Quinones met with Captain Norbert Sanchez. According to Ms. Quinones, she requested a copy of the videotape of the incident and Captain Sanchez told her she was not going to get the tape. Captain Sanchez does not recall Ms. Quinones asking for a videotape. Otero County Sheriff John Blansett subsequently received from Plaintiffs' counsel a Tort Claims Notice, dated July 9, 2006, which asked for copies of all video- and audiotapes. Pursuant to his practice, Sheriff Blansett gathered all materials related to the claim and forwarded them to the Otero County Attorney. Sheriff Blansett does not recall receiving copies of two additional written requests for the videotapes addressed to the County Clerk by Plaintiffs' attorney, dated July 20 and August 8, 2006.

Plaintiffs filed their Complaint for Damages (Docket No. 1), on January 10, 2008. They bring four causes of action: "Count One: Unlawful Arrest and Seizure," in violation of the Fourth and Fourteenth Amendments of the United States Constitution, and the tort of unlawful arrest and false imprisonment under the New Mexico Tort Claims Act ("NMTCA"), against all Defendants; "Count Two: Unlawful Excessive Force," in violation of the Fourth and Fourteenth Amendments of the United States Constitution, and assault and battery under the NMTCA, against all Defendants; "Count Three: Unlawful Search and Invasion of Privacy," in violation of the Fourth and Fourteenth Amendments to the United States Constitution, and illegal search and trespass under the NMTCA,

against all Defendants; and "Count Four: Violation of the New Mexico Public Records Act,"[7] for failure to provide a copy of the video or audio tape or give a timely explanation for not doing so, subjecting Defendant County to statutory damages of $100 per day, N.M. STAT. ANN. § 14-2-11C, and requesting a writ of mandamus or an injunction requiring compliance and release of the tape.

Defendants now move for summary judgment on grounds that the individual deputies did not violate Plaintiffs' rights because they were properly detained pursuant to an investigative detention, the proper amount of force was used to detain Plaintiffs, and the search for Agent Monreal's gun was proper. The individual defendants also argue that they are entitled to qualified immunity. Defendants additionally maintain that Plaintiffs' municipal liability claim must fail because no individual defendant violated Plaintiffs' rights and there is no evidence of any unconstitutional policy by the County that led to a deprivation of Plaintiffs' constitutional rights. Defendants further contend that Plaintiffs fail to demonstrate any violation of the NMTCA. Finally, the County asserts that it did not violate the Inspection of Public Records Act.

Summary judgment "should be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In applying this standard, the Court must "view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999).

---

[7] While Plaintiffs claim violation of the New Mexico Public Records Act, it is clear from the acts alleged in their Complaint and the statutory provisions they cite that they bring this cause of action under the New Mexico Inspection of Public Records Act ("IPRA"). *See* N.M. STAT. ANN. § 14-2-4 ("Chapter 14, Article 2 NMSA 1978 may be cited as the 'Inspection of Public Records Act'.[sic]")

When a defendant asserts qualified immunity, however, the plaintiff "must satisfy a heavy two-part burden, showing that (1) the defendant violated a constitutional or statutory right and (2) the right was clearly established at the time of the defendant's unlawful conduct." *Buck v. City of Albuquerque*, 549 F.3d 1269, 1277 (10th Cir. 2008). The Court "has discretion to determine 'which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand,'" *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009) (quoting *Pearson v. Callahan*, ___ U.S. ___, ___, 129 S. Ct. 808, 818 (2009)), but when addressing the first prong, it construes the facts "in the light most favorable to the plaintiff," *Poolaw v. Marcantel*, 565 F.3d 721, 728 (10th Cir. 2009). If the plaintiff meets the two-part test, the defendant then bears "the traditional burden of the movant for summary judgment—showing 'that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.'" *Nelson v. McMullen*, 207 F.3d 1202, 1206 (10th Cir. 2000) (quoting *Albright v. Rodriguez*, 51 F.3d 1531, 1535 (10th Cir. 1995)).

The Fourth Amendment guarantees citizens the right "to be secure in their persons . . . against unreasonable searches and seizures." While, of course, not all police-citizen encounters implicate the Fourth Amendment, *United States v. King*, 990 F.2d 1552, 1556 (10th Cir. 1993), a seizure does occur "'whenever a police officer accosts an individual and restrains his freedom to walk away,'" *Novitsky v. City of Aurora*, 491 F.3d 1244, 1253 (10th Cir. 2007) (quoting *Terry v. Ohio*, 392 U.S. 1, 16 (1968)); *see also, e.g., King*, 990 F.2d at 1556 ("a person is seized for Fourth Amendment purposes when, considering all the surrounding circumstances, the police conduct 'would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.'") (quoting *Florida v. Royer*, 460 U.S. 491,

7

497 (1983)). "The "reasonableness" of a particular seizure depends upon the balance between "'the nature and quality of the intrusion on the individual's Fourth Amendment interests . . . [and] the importance of the governmental interests alleged to justify the intrusion.'" *Novitsky*, 491 F.3d at 1253 (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)).

> The Supreme Court has held in balancing these interests that:
>
> "arrests, the most intrusive of Fourth Amendment seizures, are reasonable only if supported by probable cause." *United States v. Davis*, 94 F.3d 1465, 1468 (10th Cir. 1996) . . . . Investigative detentions, on the other hand, which are Fourth Amendment seizures of limited scope and duration, are reasonable if they are supported by a reasonable suspicion that the detained individual is engaged in criminal activity. *Id.* Similarly, officers may effect a brief non-investigatory detention in the exercise of their community caretaking functions, regardless of suspected criminal activity, when articulable facts indicate the need "to assure the safety of the public and/or the individual." *United States v. King*, 990 F.2d 1552, 1560 (10th Cir. 1993).

*Novitsky*, 491 F.3d at 1253. The two lesser governmental intrusions into an individual's liberty interest, investigatory and non-investigatory detentions, are "narrowly drawn" exceptions to the probable cause requirement. *See King*, 990 F2d at 1557. The reasonableness of such detentions, and any accompanying protective search,[8] is analyzed under the two-part test set forth in *Terry*: the officer's action must be (1) "'justified at its inception,'" and (2) "'reasonably related in scope to the circumstances which justified the interference in the first place.'" *King*, 990 F2d at 1557 (quoting *Terry*, 392 U.S. at 20); *Novitsky*, 491 F.3d at 1253.

For an investigative detention to be "justified at its inception," "the officer must have an articulable and reasonable suspicion that the person detained is engaged in criminal activity." *King*, 990 F.2d at 1557 (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). This requires a

---

[8] In addition to briefly detaining a person on less than probable cause in the course of an investigative detention, officers also may conduct a limited, protective search or frisk for weapons for their own protection. *King*, 990 F.2d at 1557 (citing *Adams v. Williams*, 407 U.S. 143, 147-48 (1972)).

"'particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007) (en banc) (quoting *Oliver v. Woods*, 209 F.3d 1179, 1186 (10th Cir. 2000)). For a protective search to meet the same test, "the officer must not only harbor an articulable and reasonable suspicion that the person is armed and dangerous, the officer must also be 'entitled to make a forcible stop.'" *King*, 990 F.2d at 1557 (quoting *Adams*, 407 U.S. at 147-48).

With regard to the second *Terry* prong, "whether the officer's action is 'reasonably related in scope to the circumstances which justified the interference in the first place,' . . . the reasonableness of the officer's action necessarily depends upon the justification for the action." *Id.* at 1557-58 (citing *Royer*, 460 U.S. at 500). Thus, an investigative detention may be unreasonable "because it is 'a more serious intrusion on [one's] personal liberty than is allowable on mere suspicion of criminal activity,'" for example, a seizure supported by reasonable suspicion, where the person "was 'as a practical matter . . . under arrest.'" *Id.* at 1557 (alteration in original) (quoting *Royer*, 460 U.S. at 502); *Cortez*, 478 F.3d at 1115-16 (use of firearms, handcuffs, other forceful techniques generally exceed scope of investigative detention and enter realm of an arrest) (citing *United States v. Melendez-Garcia*, 28 F.3d 1046, 1052 (10th Cir. 1994)). Additionally, an officer's subjective belief that he is effecting an investigative detention, rather than an arrest, is irrelevant. *Id.* at 1117 n.8. "Similarly under the *Terry's* second prong, a protective search may be unreasonable when it is not limited to ensuring that the suspect is not armed." *King*, 990 F.2d at 1558 (citing *Sibron v. New York*, 392 U.S. 40, 65 (1968)).

That Plaintiffs were seized for Fourth Amendment purposes and that Agent Monreal and the vehicle and its contents were searched are not contested. Defendants maintain, however, that the seizure was an investigative detention supported by reasonable suspicion that Plaintiffs were

9

engaged in criminal activity and that the search of Agent Monreal and the vehicle were conducted out of reasonable concern for the safety of the officers and the public.[9]  The Court does not agree.

First, describing Defendants' actions as an investigative detention more than stretches the imagination.  Plaintiffs, asleep in their vehicle, were accosted by three officers, two of whom drew their weapons.  Deputy Gutierrez pulled Agent Monreal from the car, handcuffed him face down on the ground, and left him there for up to ten minutes.  Officer Reeves made Ms. Quinones exit the vehicle at gunpoint. Deputy Odom handcuffed her and told her she was lucky she wasn't getting a bullet in the head, and she, too, was left sitting on the ground for up to ten minutes.  Moreover, even after the officers uncuffed Plaintiffs, they still were not free to go.  Defendants did not return Plaintiffs' car keys to them; rather, they called Agent Monreal's superiors with the Border Patrol, gave the keys to them, and, in Deputy Gutierrez's own words, "released" Plaintiffs to Border Patrol Agent Guerena some twenty minutes later.

Clearly, these undisputed facts are sufficient for a jury to find that Plaintiffs were for all practical purposes under arrest, not merely the subjects of an investigative detention. Significantly, Defendants do not attempt to argue that their actions were supported by probable cause to believe that Plaintiffs had committed a crime.  Even if the facts arguably could show that Defendants' actions were justified at their inception by articulable and reasonable suspicion that the sleeping occupants of the car were engaged in criminal activity, a jury could find that the scope of the detention itself was not reasonably related to the circumstances justifying the interference in the first place.

---

[9] The Court notes that Defendants did not search Ms. Quinones, but apparently did search her purse, removing her driver's license and running a warrants check.  (*See* Ps.' Resp., Attach. 8, Quinones Decl. ¶ 5.)

The same conclusion must be reached regarding the searches conducted by Deputies Gutierrez and Odom. Deputy Gutierrez did not restrict his search of Agent Monreal to a pat down for weapons, the reasonableness of which, too, would be doubtful given that the suspect was face down on the ground with his hands cuffed behind his back; he also removed Agent Monreal's wallet and Border Patrol credentials. Even then, with knowledge that Agent Monreal was a government law enforcement official, both deputies conducted a search of the vehicle and its trunk and contents for a service weapon that arguably posed no threat to them or the public and which Agent Monreal undoubtedly legally possessed. And despite their alleged suspicions, Defendants never searched Ms. Quinones.

As there are facts from which a jury could find that neither the seizures nor the searches at issue in this matter were reasonable, Defendants are not entitled to summary judgment. Furthermore, the unreasonableness of their behavior was clearly established in both Supreme Court and Tenth Circuit case law, much of which predates this incident by decades, and Defendants are not entitled to qualified immunity.

The Fourth Amendment guarantee against unreasonable seizures includes the right to be free from the use of excessive force and such claims also are analyzed under the objective reasonableness standard of that amendment. *Graham v. Connor*, 490 U.S. 386, 395-97 (1989). The interests protected are not limited to the right to be secure against physical harm, but "'include liberty, property, and privacy interests - a person's sense of security and individual dignity.'" *Cortez*, 478 F.3d at 1125-26 (quoting *Holland ex re. Overdorff v. Harrington*, 268 F.3d 1179, 1196 (10th Cir. 2001)).

Determining whether the force used in a particular seizure is reasonable requires a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake," taking into considerations factors such as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. The reasonableness of the level of force used

> must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . . As in other Fourth Amendment contexts, however, the reasonableness inquiry . . . is an objective one: the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; neither will an officer's good intentions make an objectively unreasonable use of force constitutional.

*Graham*, 490 U.S. at 397 (internal citations and quotations omitted). The nature of the inquiry does not differ whether the force applied is in the context of an arrest or an investigative detention, but "the benchmark for what is reasonable does differ." *Cortez*, 478 F.3d at 1126 (citing *United States v. Merritt*, 695 F.2d 1263, 1274 (10th Cir. 1982)). As the *Cortez* court further explained,

> the excessive force inquiry evaluates the force used in a given arrest or detention against the force reasonably necessary to effect a lawful arrest or detention under the circumstances of the case. Thus, in a case where police effect an arrest without probable cause or a detention without reasonable suspicion, but use no more force than would have been reasonably necessary if the arrest or the detention were warranted, the plaintiff has a claim for unlawful arrest or detention,[10] but not an additional claim for excessive force.

*Id.* On the other hand,

---

[10] As the *Cortez* court noted, damages for an unlawful arrest without probable cause, "includes damages resulting from any force reasonably employed in effecting the arrest," and damages for an unlawful detention lacking reasonable suspicion, "includes damages resulting from any force reasonably employed in effecting the detention." 478 F.3d at 1128 & n. 23.

12

> [i]f the plaintiff can prove that the officers used greater force than would have been reasonably necessary to effect a lawful arrest, he is entitled to damages resulting from that excessive force[, and i]f the plaintiff can prove that the officers used greater force than would have been reasonably necessary to effect a lawful detention, he is entitled to damages resulting from that excessive force.

*Id.* at 1127 & n.23.

Defendants maintain that the force they employed on Plaintiffs during the investigative detention was reasonable under the circumstances and the handcuffing did not cause injury to Plaintiffs, thereby entitling them to judgment as a matter of law. Again, the Court does not agree.

As discussed above, there are facts from which a jury could find that the force Defendants employed far exceeded that reasonably necessary to effect a lawful detention. Indeed, in approaching with weapons drawn and pointed at Plaintiffs, forcibly removing Plaintiffs from their vehicle and handcuffing them, searching Agent Monreal and keeping him face down on the ground for up to ten minutes, telling Ms. Quinones she was lucky she wasn't getting a bullet in her head, and detaining Plaintiffs for an additional twenty minutes, a jury could find that Defendants effected a seizure that rose to the level of an arrest, unjustified by any initial concerns for officer safety, or that of the public, or maintenance of the status quo. Additionally, Plaintiffs have adequately alleged injury to their personal security and individual dignity interests, which is more than de minimis, including humiliation, embarrassment, and mental suffering. Furthermore, the law regarding this claim was clearly established. *Cortez*, 478 F.3d at 1131-32 (so holding for excessive force claim stemming from investigative detention that occurred on May 26, 2001). Therefore, Defendants' Motion must be denied as to this claim, as well.

Defendants contend that they are entitled to summary judgment Plaintiffs' municipal liability claim on grounds that no individual defendants violated any of Plaintiffs' constitutional rights and

13

that Plaintiffs have offered no evidentiary proof of any unconstitutional policy that led to a deprivation of their constitutional rights. Given that the Court has not granted Defendants summary judgment on Plaintiffs' Fourth Amendment claims, the Defendants' first argument obviously fails. Additionally, Plaintiffs have offered evidence that Defendants actions were taken pursuant to County policy and training and that supervisory officers ratified those actions. (*See* Defs.' Mot. Summ. J., Ex. A, Gutierrez Dep., 24:7-20 ("I felt that as far as policy went, I felt I complied with it as closely as possible considering the situation."), 43:12-18 ("Q. Have you had any training as to when it's appropriate to handcuff a person? A. Yes, sir. Q. And in relationship to this incident, what does that training tell you? Q. It's for an investigative detention and officer safety matters, to retrain [sic] them."); *id.* Ex. C, Odom Dep. 13:23-14:4 ("Basically it's officer safety, that's what they teach you. . . . If you don't know what's going on, you handcuff people until you figure out what's going on."); *id.* Ex. F, Blansett Dep. 9:23-11:25 (affirming appropriateness of procedures used regarding seizures and search of vehicle); Pls.' Resp., Attach. 10, Sanchez Dep. 9:14-18 ("I told [Ms. Quinones] I concurred with what Sergeant Gutierrez and the deputies did."), 10:24-11:1 ("I told [Ms. Quinones] . . . that I concurred with what the deputies did and they followed procedures and did what they needed to do."). Thus, Defendants' Motion must be denied in this regard.

Similarly to their initial argument regarding municipal liability, Defendants assert that because the undisputed facts in the record are fatal to Plaintiffs' federal claims, they likewise require entry of summary judgment on Plaintiffs' state law tort claims. As the constitutional claims remain, so, too, will Defendants' Motion be denied as to Plaintiffs' NMTCA claims.

14

Finally, Defendants also move for summary judgment on Plaintiffs' claim for violation of the New Mexico Inspection of Public Records Act ("IPRA"). Pursuant to the IPRA, "[e]very person has a right to inspect public records of this state," subject to certain exceptions not at issue here. N.M. STAT. ANN. § 14-2-1(A). Procedures for requesting such records include:

> A. Any person wishing to inspect public records may submit an oral or written request to the custodian. However, the procedures set forth in this section shall be in response to a written request. The failure to respond to an oral request shall not subject the custodian to any penalty.
> . . . .
> D. A custodian receiving a written request shall permit the inspection immediately or as soon as is practicable under the circumstances, but not later than fifteen days after receiving a written request. If the inspection is not permitted within three business days, the custodian shall explain in writing when the records will be available for inspection or when the public body will respond to the request. The three-day period shall not begin until the written request is delivered to the office of the custodian.

*Id.* § 14-2-8. A person whose request for public records has been denied may bring an action to enforce the provisions of the Act. *Id.* § 14-2-12.

Plaintiffs allege that their attorney requested in writing from the County and Sheriff's Office copies of a video tape or audio tape of the May 13, 2006, police encounter on four different occasions, May 16, July 6, July 20, and August 8, 2006,[11] and that Defendants' refused to provide a copy of the tape or a timely explanation of their denial. (Compl. ¶¶ 15-16, 22, 37-38.) Defendants contend that because Plaintiffs' initial written request was made in connection with their state Tort Claim Notice, Sheriff Blansett, consistent with his policy and practice, was justified in forwarding the Notice to the County's attorney and in assuming the attorney would handle the IPRA request as a discovery request. Defendants further maintain that Plaintiffs' second request, contained in the

---

[11] Only one of these letters is currently in the record. It is dated July 9, 2006, and is referenced as "Amended Notice of claim . . . ." (Ex. 2 to Pls.' Resp. (Docket No. 33, Part 15.) The Court assumes that this is second letter to which Plaintiffs refer.

15

Amended Notice, dated July 9, 2006, similarly was forwarded to the County Attorney and that the final two letters were sent to the Otero County Clerk and Sheriff Blansett does not recall seeing them.  Plaintiffs respond that there is no exception for records that an attorney requests on behalf of a client under the IPRA and Defendants' Motion must be denied.

The Court first must note that neither Defendants nor Plaintiffs have cited any authority or made other than conclusory argument in support of their positions.  Defendants, thus, have failed to meet their burden for summary judgment.  In any case, the Court is not inclined to interpret the rights conveyed to individuals under the IPRA as being limited by litigation.  (*Cf. Noland v. City of Albuquerque*, No. CIV-08-0056 JB/LFG, 2009 WL 5217998, at *1-3 (D.N.M. filed Oct. 27, 2009) ("Like [the Freedom of Information Act] the IPRA provides a statutory right to request information, independent of the limits or constraints on discovery provided in the Federal Rules of Civil Procedure.").  Whether Plaintiffs can meet their burden to prove a viable IPRA claim at trial, of course, remains to be seen.[12]

WHEREFORE,

---

[12]    As discussed, the only evidence in the record as to the content of Plaintiffs' IPRA requests is the July 9, 2006, "Amended Notice."  It is at least arguably ambiguous as to whether it makes a valid IPRA request, or merely refers to discovery, and is incorrect as to the law regarding Ms. Quinones's oral IPRA requests, stating:

> We understand that there is a video tape and possible audio tapes of the incident and we request that this evidence be preserved.  We further request a copy of all reports, video and audio tapes of the incident and a list of all officers present at the scene with their full name and rank.
>
> Ms. Quinones has previously requested a copy of the video tape from Captain Sanchez which was refused.  This is a violation of the New Mexico Public Records act for which attorney fees and other damages are available.

(Ex. 2 to Pls.' Resp. (Docket No. 33, Part 15).)

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (Docket No. 32), filed November 26, 2008, is **DENIED**.

_____
**SENIOR UNITED STATES DISTRICT JUDGE**